E. General intangibles, now owned or after acquired.

F. All interest in goods or merchandise as to which account receivable for goods sold or delivered has arisen.

G. All goods, instruments, documents of title, policies and certificates of insurance, securities, chattel paper, deposits, cash or other property owned by the debtor or in which it has no interest which are now or may hereafter be in possession of the secured party as to which the secured party may now or hereafter control possession by documents of title or otherwise.

H. All equipment, machinery and tools of trade now owned or after acquired.

I. Seeds and products of the foregoing.

This all-encompassing list is clearly intended to secure as collateral substantially all of the assets of the debtor, Allstar Building. This supports the district court's finding that a security interest in substantially all of the debtor's property was granted.

However, the trustee did not carry his burden with respect to the corporate resolution. It was not up to Overhead to produce one, it was the trustee's burden to prove that one was *not* executed. Allstar proved the validity of his security interest. The trustee proved nothing. Therefore, Allstar ought to prevail.

Appellant argues that the trustee, because he was not a party to the challenged transaction, does not have standing to challenge the security agreement as *ultra vires*. Appellant maintains that the defense of ultra vires has been abolished by statute in Alabama by virtue of Title 10–2A–24, and may be asserted only in three limited circumstances (none of which are present here). Appellant cites an eighth circuit case, *In Re: Terminal Moving and Storage Co., Inc.*, 631 F.2d 547 (8th Cir. 1980) in support of this proposition. Evidently the Arkansas ultra vires statute is identical to the Alabama code provision abolishing the defense of *ultra vires*. In interpreting the Arkansas statute, the Eighth Circuit held that trustees in bankruptcy, because they have no greater rights than the creditors which they represent, do not have standing to attack a corporate transaction as *ultra vires* unless they are a party to the transaction.

I am not persuaded that the term *"ultra vires"* applies in this context. However, that issue need not be decided now. As noted above, I am of the opinion that it is the trustee's duty to challenge the transaction once the debtor has proved the existence of a valid security interest and that the debtor has equity in the property. Had the trustee challenged the transaction as illegal under the Alabama Business Code, and successfully proven that a resolution was required yet never passed, Overhead could have responded by claiming that the trustee had no standing to do so. The argument about standing is best made in bankruptcy court during the initial proceedings. Because I feel the panel's opinion unfairly adds to a secured party's burdens in bankruptcy court, I respectfully dissent.

**Gary Wayne ANDREWS,**
**Plaintiff-Appellee,**

v.

**Joe N. BENSON, Defendant,**

**James Carden, Ralph Jarrell and Ernest Adcox Jr., Defendants-Appellants.**

**No. 86–7049.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 17, 1987.

Herbert S. Sanger, Jr., General Counsel, TVA, James E. Fox, Deputy General Counsel, Brent R. Marquand, James G. Touhey, Jr., Edwin W. Small, Knoxville, Tenn., for defendants-appellants.

Roger L. Lucas, Emond & Vines, Birmingham, Ala., for plaintiff-appellee.

Before HILL and FAY, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

Appellants/defendants Ralph W. Jarrell, James M. Carden and Ernest Adcox, Jr.[1] appeal from a jury verdict in the amount of $156,000 in favor of appellee/plaintiff Gary Andrews. In the district court, appellee sued the appellants, his co-employees at Tennessee Valley Authority (TVA), for negligence after his on-the-job injury. Appellants contend that the Eleventh Circuit should overturn the jury verdict because the appellants have not breached any legal duty to the appellee, the appellants are protected by the exclusive remedy provisions of the Federal Employees' Compensation Act (FECA), and the appellants have absolute immunity for common law torts for their official job responsibilities as supervisory employers. Furthermore, the district court refused to give the jury the appellants' assumption of risk charge under Alabama law. We find no reversible error in the proceedings below.

## I. FACTS

Appellee Gary Andrews worked for TVA as a lineman on construction projects. The day of the accident, November 12, 1981, Andrews was helping erect high power transmission lines near Decatur, Alabama. TVA had equipped Andrews with a set of hooks or gaffs, a body belt, and a safety strap. A lineman uses the sharpened metal gaffs, placed on the inside of each of his ankles, to thrust into the pole as he climbs it. The body belt circles the lineman's waist and has two metal D–rings, one on each hip. The safety strap, a leather strap approximately 6 to 8 feet long, has metal snaps that hook into the D–rings on the body belt.

With this equipment, Andrews used the hitchhiking method of climbing to ascend and descend the high power transmission pole. To hitchhike up the pole, Andrews first fastened his safety strap around the pole. Then Andrews continually edged the safety strap up the pole while using his gaffs to climb. To negotiate around one of the three crossarms on the pole, Andrews had to release the safety strap circling the pole and use his hands to grip the pole while he climbed above the crossarm. Once past the crossarm, Andrews reached around the pole and refastened his safety strap. Using this method, Andrews ascended the pole without any difficulties.

---

1. The district court granted a directed verdict for defendant Joe N. Benson, Director of Trans-mission Systems Engineering Construction. Andrews has not appealed Benson's dismissal.

After completing work on the insulators at the top of the pole, Andrews descended to the lowest crossarm, approximately 40 feet above the ground. Andrews then released his safety strap and maneuvered past the crossarm. As he attempted to pass the safety strap from one hand to the other to resecure it, his climbing gaffs "slipped out" of the pole. Andrews fell 40 feet to the ground and permanently injured his back.

Consequently, Andrews sued four co-employees at TVA: James M. Carden, Staff Safety Engineer; Ralph W. Jarrell, Area Construction Manager, Central Area; Joe N. Benson, Division Safety Director, and Ernest Adcox, Jr., Transmission Line Construction Foreman.[2] Andrews alleged that the appellants breached their legal duty to him by failing to provide him a lanyard as required by TVA's safety rules. A lanyard would be tied to the crossarm to prevent a lineman from falling while his safety belt was unhooked. There are three statutes to consider for definition of the appellants' safety duties. First, TVA's Occupational Health and Safety Program has implemented the Occupational Safety and Health Administration (OSHA) Construction Industry Health and Safety Standards, 29 C.F.R. § 1926 (1985). The OSHA standards provide that personal climbing equipment while erecting transmission lines is to be worn as follows:

Body belts with straps or lanyards shall be worn to protect employees working at elevated locations on poles, towers, or other structures except where such use creates a greater hazard to the safety of the employees, in which case other safeguards shall be employed.

29 C.F.R. § 1926.951(b)(1). Second, the divisional *Safety Manual* of TVA's Division of Transmission Systems Engineering and Construction provides the following guidance on climbing equipment:

An approved body belt with safety strap or lanyard will be used for any work performed above ground level.

Third, § 609 of TVA's Hazard Control Manual[3] discusses safety equipment for linemen:

Body belts or harnesses with life lines and/or lanyards shall be worn while working more than six feet off the ground when there is a fall potential and under the following conditions ...

Condition E—Working from a pole, steel structure or an aerial life bucket.

The matter proceeded to trial in November of 1984. After the close of all the evidence, the appellants renewed their motion for a directed verdict, alleging that the evidence did not prove that the appellants had breached any legal duty to Andrews. Furthermore, the exclusive remedy provision of FECA or the absolute immunity for federal supervisory employees performing their duties protected them from tort suits such as this. The district court denied the appellants' motion and thereafter charged the jury. In his charge, the district judge refused to include the appellants' requested charge on assumption of risk because Alabama law does not allow such a charge in co-employee suits. The jury then returned a verdict in favor of Andrews in the amount of $156,000. This appeal ensued.

## II. THE LEGAL DUTY OF CO–EMPLOYEES

■ The starting point in Alabama law for determining the legal duty owed by a co-employee to an injured employee is *Fireman's Fund Am. Ins. Co. v. Coleman*, 394 So.2d 334 (Ala.1980). An injured employee cannot simply allege that a co-employee had to provide a reasonably safe place to work, but the employee must prove "with specificity the defendant's delegated or assumed duty and its breach for which recovery is sought." *Id.* at 347. A co-employee will not be held liable just because he is in

---

2. Ernest Adcox, Jr. was the supervisor of Andrews' crew foreman, Henry P. Miller. Andrews did not sue Miller.

3. In the district court, appellants argued that the OSHA standards superceded § 609, but Andrews pointed out that TVA revised the section after adopting OSHA.

an administrative or supervisory position. *Clements v. Webster*, 425 So.2d 1058, 1059 (Ala.1982).

■ Appellee Andrews asserts that each of the appellants had a duty to provide a safe working place and specifically to insure that a lineman had proper climbing equipment as required by OSHA regulations and TVA standards. The job description of each of the appellants is helpful in determining his safety responsibilities. Ernest Adcox, Jr. would oversee parts of the construction project and insure that the work was performed in a safe manner and in accordance with plans and specifications. Additionally, he was to stop any unsafe practices he observed and to make sure the workers were using the proper equipment. According to his testimony, he did not have the authority to make additions to the safety rules. Another defendant, Ralph Jarrell, was the central area construction manager for the division of Transmission Systems Engineering. His safety-related duties involved insuring the enforcement of the work safety standards on a day-to-day basis and stimulating interest in accident prevention. It was also Jarrell's responsibility to correct any misapplication of the safety rules. The third defendant was James M. Carden, staff safety engineer for TVA. His duties included observing the work in progress to check for compliance with the safety rules. If there was any deviation from the safety procedures, he was to submit a written report of the violation. Furthermore, he was to recommend corrective action if he found anything inconsistent with good safe work practices.

■ Clearly then, the duties of each of the appellants included maintaining safe working conditions, primarily by the fulfillment of the safety standards as indicated by the OSHA regulations and the TVA standards. Failure to implement the safety regulations would result in a legal breach of their duties. The two parties differ, however, on their interpretations of the safety regulations. The appellants insist that the safety regulations for TVA have never required a lanyard in addition to a safety belt. The regulations say lanyard *or* safety belt. The appellants fulfilled their duty by simply providing a safety belt. Moreover, all of TVA interprets the regulations this way, so the appellants could not have breached any duty to Andrews when they were unaware that any such duty even existed.

The appellee counters the appellants' position by interpreting the regulations to require a lanyard or safety belt at all times for any work above the ground. When Andrews maneuvered past the crossarm, he had to release his safety strap. Therefore, Andrews should have had a lanyard to protect him against falling while the safety belt was unavailable. A TVA safety specialist acknowledged that a lineman needs some safety attachment at all times when working above the ground.[4] Nevertheless, he maintained that a lineman is not "working" when climbing up and down a pole. A lineman, however, gets paid for all the time that he spends on the pole, whether climbing or stationary.[5]

Q: Are they [lineman] on the job when they start up that pole?
A: Yes.
Q: Are they performing their duties as part of their work?
A: (No audible answer.)
Q: Are they being paid when they are climbing up?
A: Yes sir.
Q: Same thing, do they, does the rate of pay change when they get to the crossarm and start working?
A: No, sir.
Q: Are they being paid when they come down the pole?
A: Yes, sir.

4. Several TVA witnesses indicated that another method for climbing poles is the rhythm method. Using that method, a lineman grips the pole with his hands and climbs it without the use of any safety strap. Only after the lineman stops does he attach his safety strap around the pole. Andrews testified that any lineman caught rhythm walking at TVA would be laid off. (Record at 158). The safety regulations would appear to prohibit the use of the rhythm method at certain elevations, but we do not have to decide that question in this appeal.

5. On cross-examination, Richard Minter, safety specialist at TVA testified as follows:

The record indicates that the appellants had knowledge, through inspections of the job site, that a lineman must release his safety strap when maneuvering past a crossarm. The safety standards clearly say that a lineman was to use a safety strap while working above ground. The appellants breached their co-employee duties to Andrews by not enforcing the directives of the safety regulations. The presence of a crossarm on a pole should not nullify the continual safety protection required by the TVA safety regulations.

## III. EXCLUSIVE REMEDY PROVISIONS OF FECA

■ The appellants contend that they are the alter egos or instrumentalities of their employer TVA and, therefore, that they should be accorded immunity under the exclusive remedy provision [6] of the Federal Employees Compensation Act (FECA), 5 U.S.C. § 8101–8193 (1982). *Heathcoat v. Potts*, 790 F.2d 1540 (11th Cir.1986) is directly on point on this issue. Mrs. Leonard Heathcoat brought a wrongful death action against certain supervisory employees at TVA after her husband was killed while working for TVA on the demolition of a building. The *Heathcoat* court held that the exclusive remedy provision of FECA does not bar suits by co-employees, according to a careful reading of *Allman v. Hanley*, 302 F.2d 559, 563 (5th Cir.1962). The *Allman* court found that unless the statute specifically abrogates the common law right to sue a co-employee, it should not be interpreted to do so. Under such a reading of the statute, the exclusive remedy provisions of FECA does not afford the appellants immunity in this case.

Q: Are they performing their duties?
A: (Nodding head affirmatively.)

6. The exclusive remedy provision, § 8116(c), of FECA states the following:

(c) The liability of the United States or an instrumentality thereof under this subchapter or any extension thereof with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States or the instrumentality to the employee, his legal representative, spouse, dependents,

## IV. DOCTRINE OF OFFICIAL IMMUNITY

■ Appellants contend that the doctrine of official immunity protects them from liability in this lawsuit. The doctrine exempts a government employee from liability for common law tort suits "only if the challenged conduct is a discretionary act *and* is within the outer perimeter of the actor's line of duty." *Johns v. Pettibone Corp.*, 769 F.2d 724, 728 (11th Cir.1985) (emphasis in original). Both sides agree that the acts in issue here are within the outer perimeter of the appellants' line of duty. Therefore, granting of official immunity turns on whether the appellants' acts were discretionary. This court has held that official immunity protects only those acts of a federal employee that involve planning or policy considerations while acts involving day-to-day operations are not covered by official immunity. *Franks v. Bolden*, 774 F.2d 1552, 1555 (11th Cir.1985). The appellants' duty to implement the current safety regulations is a day-to-day operation with no discretionary attributes.

Appellants cite to *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), as an example of discretionary activities exempt under the immunity provision of the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1982). There the Federal Aviation Administration (FAA) employees executed a "spot check" program of aircraft design elements in order to insure manufacturers' compliance with minimum safety regulations. Such a program would necessarily involve discretion in deciding which aircraft design elements

next of kin, and any other person otherwise entitled to recover damages from the United States or the instrumentality because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statute. However, this subsection does not apply to a master or a member of a crew of a vessel.
FECA, 5 U.S.C. § 8116(c) (1982).

to inspect. The employees' alleged negligence was within their discretionary activities, thereby exempt under the immunity doctrine. *Id.* at 819–20, 104 S.Ct. at 2768–69. This case, however, presents a different scenario. The appellants, in their capacities as supervisors, had to insure the day-to-day enforcement of OSHA standards and TVA regulations. Such operational acts are not discretionary under the guidelines of *Franks v. Bolden.*

## V. ASSUMPTION OF RISK CHARGE

 The district court denied appellants' requested instruction on assumption of risk because of a statement in Justice Jones' concurring opinion in *Fireman's Fund Am. Ins. Co. v. Coleman,* 394 So.2d 334 (Ala.1980). Justice Jones stated that the traditional common law defense "assumption of risk" was not available in co-employee suits. Throughout the evolvement of the assumption of risk defense, its application (other than for the application of contributory negligence) has never been extended beyond the master-servant relationship context. *Id.* at 348–49. This concurring opinion has not been specifically overruled by later cases.

The appellants, however, indicate that the Alabama Supreme Court has implicitly overruled Justice Jones in *Wilkins v. West Point Pepperell, Inc.,* 397 So.2d 115 (Ala. 1981). Wilkins, who had contracted brown lung disease, sued several supervisory co-employees for negligently failing to provide him with a safe place to work. The court discussed "assumption of risk as a matter of law" principle in the true occupational disease context, but the defense was not utilized in the case. *Id.* at 118.

To explain the disparity between *Fireman's Fund* and *Wilkins,* the appellee points to the Alabama Supreme Court's statements on the dual meaning of the term "assumption of risk." *Employers Casualty Co., etc. v. Hagendorfer,* 393 So.2d 999, 1001 n. 1 (Ala.1981).[7] In the primary meaning of the term, the appellee acts reasonably when assuming the risk, thus constituting a denial of the defendant's negligence. *Id.* According to the appellee, this type of assumption occurs in true occupational disease cases like *Wilkins,* not the present case. The *Wilkins* court stated that "if Wilkins [a plaintiff] meets his burden of proving the material elements of his claim (*i.e.,* the alleged degree of defendant's culpability proximately causing his injury), necessarily, he will remove himself from 'assumption of the risk' defense," thereby rising above the true occupational disease context. *Wilkins,* 397 So.2d at 118–19. In the secondary meaning of assumption of risk, the defendant must act unreasonably, thus akin to the contributory negligence defense. *Id.* This meaning is applicable to the *Fireman's Fund* case. Two cases, *Hagendorfer,* 393 So.2d at 1001, and *McGeever v. O'Byrne,* 203 Ala. 266, 82 So. 508 (1919), acknowledged that in cases involving the secondary meaning it is not important whether a given plea be called one of assumption of risk or a plea of contributory negligence.

The district court in this case instructed the jury on contributory negligence. Such a charge is sufficient when the secondary meaning of assumption of risk is applicable to the case and when TVA produced no authority at the time of trial that the assumption of risk charge should be given.[8] Under the facts of this case, we refuse to

---

7. Justice Jones made no distinction between the primary and secondary meaning of assumption of risk when he stated that it was not applicable to co-employee suits.

8. United States District Judge U.W. Clemon stated the following:

 [P]laintiff's requested jury charge number three is covered insofar as it deals with contributory negligence, it is refused insofar as it deals with assumption risk. The court will not charge the jury on assumption of risk, it

being presented with no authority for so doing. The concurring opinion of Mr. Justice Jones in the Fireman's Fund case indicates that assumption of risk is not a defense in these types of cases. And since basically what I do is sit as an Alabama Circuit Judge, I'll follow that concurring opinion since it seems to be the only expression by a member of the Supreme Court on the issue.

(Record at 414–15).

reverse the district court based on its failure to give an assumption of risk charge.

## VI. CONCLUSION

We have reviewed the appellants' four issues raised on appeal and have found no error at the district court level that would support reversal.

AFFIRMED.

HILL, Circuit Judge, concurring specially:

I concur, but only because we are bound by precedent requiring this result.

The appellee sues on account of injuries suffered by him while on the job for Tennessee Valley Authority (TVA). The Federal Employees Compensation Act (FECA), 5 U.S.C. §§ 8101–8193 (1982), provides the exclusive remedy against TVA for such injuries. The doctrine of official immunity, *Barr v. Matteo,* 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959), prohibits one employee of the federal government from suing a co-employee who was acting within the "outer perimeter" of his lines of duty. Yet, as this case illustrates, we have preserved for employees of TVA not only their FECA benefits for injury, but unlimited tort actions as well. Our cases say, in the style familiar to case book readers, "The law does not permit you to sue in tort for damages, so the law provides that you may sue in tort for damages."

Apparently, we misread *Barr v. Matteo, supra.* It held that the doctrine of official immunity is available to an employee *even though* the employee was performing a discretionary act. In *Stepanian v. Addis,* 699 F.2d 1046 (11th Cir.1983), we wrote that immunity was available *only if* the employee was performing a discretionary act. We have followed this line, *Johns v. Pettibone Corp.,* 769 F.2d 724 (11th Cir. 1985), and our panel is bound.

I suggest that our precedent is incorrect. The appellants in this case should be found immune because all acts or omissions charged against them were well within the outer perimeters of their duties. However, we are bound by prior panel decisions and, properly, may not alter their holdings.

Therefore, I concur.