**DICKERSON, INC., et al., Plaintiffs,**

v.

**Floyd C. HOLLOWAY, et al.,
Defendants.**

No. 82–244–Civ–3–14.

United States District Court,
M.D. Florida,
Jacksonville Division.

April 27, 1987.

Richard G. Rumrell, Geoffrey S. Welch, Alan B. Vlcek, Rumrell & Vlcek, Jacksonville, Fla., for plaintiffs.

Dorothea Beane, Asst. U.S. Atty., Jacksonville, Fla., Roberta T. Eaton, Sharron J. Philo, Defense Reutilization and Marketing

Services, Federal Center, Office of Counsel, Battle Creek, Mich., for U.S.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DAVID S. PORTER, Senior District Judge, sitting by designation [*]:

Plaintiffs, Dickerson, Inc., Dickerson Florida, Inc., and Dickerson Realty Florida (hereinafter referred to in the singular as plaintiff) brought this negligence action against the United States pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680. Jurisdiction is based on 28 U.S.C. § 1346. Plaintiff alleges that the United States was negligent in the selection and supervision of American Electric Corporation (AEC) as a contractor for the disposal of polychlorinated biphenyls (PCBs), a highly toxic and extremely persistent substance, from U.S. military bases around the country. Plaintiff contends that as a result of the government's breach of duty, PCB contaminated plaintiff's fuel storage tanks causing significant damage. The United States contends that it is immune from liability in this suit pursuant to the FTCA, and, if we find there is no immunity, that plaintiff has not sufficiently proved that the government's breach was the direct and proximate cause of plaintiff's damages.

The Court denied the government's motion for summary judgment, and the matter came on for trial in Ocala, Florida on January 5, 1987. The parties have submitted proposed Findings of Fact and Conclusions of Law, as well as post-trial briefs on the issue of chain of custody of the PCB contaminated oil. Having carefully considered the exhibits, the testimony adduced at trial, the considerable deposition testimony, and the submissions of the parties, we issue the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure.

[*] The Honorable David S. Porter, United States Senior Judge, Southern District of Ohio, sitting by designation.

1. In 1985, Dickerson, Inc., Dickerson Florida, Inc., and Dickerson Florida Realty, Inc. sold its

## FINDINGS OF FACT

1. Plaintiff, Dickerson, Inc. (Dickerson), was and is a corporation organized and incorporated under the laws of the State of North Carolina, with its principal place of business in the State of North Carolina. Dickerson is engaged in road paving and other asphalt work in Jacksonville, Florida.

2. The successors-in-interest of Dickerson, Inc. are Dickerson Florida, Inc. (Dickerson Florida), and Dickerson Realty Florida, Inc. These companies were formed on or about April 1, 1982 and are incorporated under the laws of Florida, and have their principal place of business in Duval County, Florida.

3. Defendant, United States Government, through the Defense Property Disposal Service (DPDS) (now the Defense Reutilization and Marketing Service (DRMS)), is an agency within the Department of Defense (DOD).

4. Dickerson had three asphalt facilities in Jacksonville, Florida. Those facilities were located at Plant 19 on Sommers Road, Plant 33 on Edwards Street, and Plant 28 on Shad Road in Jacksonville, Florida.

5. At all material times before April 1, 1982, Thomas C. Lillard was Executive Vice President of Dickerson, Inc. and was in charge of each of the three Jacksonville facilities.[1]

6. The operations at each asphalt plant included heating the asphalt so that the asphalt could be transported to locations where asphalt was needed.

7. Dickerson utilized No. 2 diesel fuel oil and waste fuel oil for the sole purpose of heating the asphalt. Dickerson commenced using waste oil during the oil shortage in 1978 because it was cheaper than other comparable fuel sources (Tr. at 37; Deposition of Lillard, Vol. I at 44–45).

8. Sometime after 1980 Dickerson applied for a modification of its state permit

Jacksonville, Florida operations to the Lillard Group, with the exception of the land located on Edwards Street where the large tank which is more fully described hereinafter was located.

in order to burn waste oil without violating the permit provisions (Tr. 514). Wayne E. Tutt from the City of Jacksonville Bio–Environmental Services sent a letter dated May 8, 1981 to Dickerson, which states in pertinent part:

> A review of your annual report submitted for calendar year 1980 indicates that your asphalt batch plant located at 8708 Sommers Road used 439,430 gallons of waste oil. Your Air Pollution Operating Permit # A016–28762 indicates that # 2 diesel fuel is the only fuel in use at the Sommer Road facility. The use of waste oil would represent a violation of permit conditions pursuant to Chapter 403.161 Florida Statutes.

Plaintiffs Exhibit 24.

9. Dickerson received the fuel oil and waste fuel oil from three suppliers, Floyd C. Holloway, doing business as Holloway Waste Oil ("Holloway"), Bill John's Oil Company, and C & C Bulk and Liquid Transfer Company. At no time did Dickerson use the waste oil for any other purpose other than as a fuel source; *i.e.*, it was never used as a sealant, coating, or dust control agent. Holloway supplied more than eighty (80%) percent of all the waste oil received by Dickerson during the period from March, 1981 until January 6, 1982 (Tr. at 20, 154).

10. It is unclear what percentage of Holloway's waste oil came from AEC during the relevant time period. Ken Graden, a long-time Holloway employee primarily charged with the job of making local pickups, estimated he personally picked up 5% of Holloway's total waste oil from AEC (Tr. at 176).

11. Several types of fuel oil storage tanks were located at each of the three facilities of Dickerson, Inc. (Edwards Street, Shad Road, and Sommers Road). The Edwards Street storage tank also included a 250,000 gallon tank which was built at the direction of T.C. Lillard. This storage tank was constructed between March and August 1981, and was used solely for storage in August, 1981.

12. Holloway was in the business of selling waste fuel oil to various customers, including Dickerson. Holloway owned several trucks including a red tanker truck that he used to haul waste fuel oil to his customers. He parked the red tanker in the AEC yard. (*See* Deposition of Quackenbush at 31.) His primary assistant for the hauling of waste oil was Kenneth W. Graden.

13. Holloway permitted AEC, a company engaged in the business of removing, storing, and disposing of PCB contaminated material and transformers to store its transformers and other equipment on several parcels of property owned by Holloway.[2] Those facilities were located on Guthrie Street, Raiford Street, and Lane Avenue in Jacksonville, Florida.

14. AEC conducted its operations from its main facility on Ellis Road in Jacksonville, Florida. The company was, however, also affiliated with American Environmental Protection Corporation ("AEPC") located in Greensboro, Alabama, and American Environmental Energy Corporation ("AEEC") located on Swann Avenue in Jacksonville. Maxwell Cobb's father-in-law was President of AEPC, and Michael Hamm was President of AEEC. The property located in Greensboro, Alabama was owned by Michael Hamm.[3] At the AEC facility in Jacksonville were both aboveground and underground storage tanks for PCB liquids.

15. Pursuant to Defense Environmental Quality Program and Policy Memoranda 80–5 and 80–9, DPDS assumed responsibility for the disposal of PCBs from military installations throughout the United States.

---

**2.** AEC was originally a party defendant to the suit. In 1982, the U.S. Government indicted AEC and its officers, Maxwell Cobb and Michael Hamm. Cobb and Hamm were acquitted on charges of criminal wrongdoing in the hauling of PCB materials. The remaining count involving the Dickerson oil was not pursued by the U.S. Government. In 1983, AEC sought protection from its creditors under the bankruptcy laws.

**3.** The "facility" located at Greensboro, Alabama was actually an antebellum home owned by Michael Hamm which could not have accepted *any* hazardous material.

16. In 1981, DPDS entered into contracts with private contractors to package, transport, and dispose PCBs from various military installations. These contracts required that PCBs be packaged, transported and disposed of in accordance with all applicable laws and regulations, and that PCB materials containing more than 50 parts per million be disposed of at facilities permitted by the United States Environmental Protection Agency.

17. In 1981, defendant, United States Government, through the Defense Property Disposal Service (DPDS) awarded and administered two contracts to AEC, a former defendant in this case, for the disposal of PCBs.

18. The first contract, known as the "Ogden I" contract, was awarded and administered by Ernest L. Bertagnolli, an employee of DPDS's Regional Office in Ogden, Utah. This contract covered the disposal of PCBs from several military installations in the states of Utah and California.

19. The other contract, known as the "Battle Creek I" contract, was awarded and administered by Ronald W. Wagner, an employee of DPDS, located at DPDS's headquarters in Battle Creek, Michigan. The Battle Creek I contract covered the disposal of PCBs from various military installations in the northeastern and southern states.

20. Both Bertagnolli and Wagner were contract specialists who had no prior background or training with PCB material or other hazardous waste. (See Deposition of Bertagnolli, Vol. I at 23.)

21. DPDS adhered to an internal policy and rule of being responsible for the ultimate disposal of PCB contaminated contents from the point of its generator until final disposal. This policy is commonly referred to as "cradle to grave" responsibility. (See plaintiffs' exhibit 36.)

22. In order to encourage small businesses to participate in the disposal of PCBs from DOD facilities in the western and eastern United States, the DPDS subdivided the Ogden I and Battle Creek I contracts into separate line-item bids. The separate line items enabled a large number of small companies to bid competitively for each of the jobs. Moreover, DPDS believed the overall contract prices could be reduced by increasing the number of bidders. AEC was the lowest bidder on a significant portion of the contracts. *See Review of Hazardous Waste Disposal Practices at Federal Facilities,* 98th Cong., 1st Sess. 6–9 (1983) (Defendant's Exhibit 41).

23. At the time of the letting of the first contract Ogden I, only two places in the United States could legally incinerate PCBs in excess of 500 ppm. Those facilities were Rollins and ENSCO.

24. In accordance with the Defense Acquisition Regulations, prior to awarding the Ogden I and Battle Creek I contracts to AEC both Mr. Bertagnolli and Mr. Wagner requested that a pre-award survey be conducted on AEC.

25. The Defense Contract Administrative Services Management Area, Orlando, Florida conducted both pre-award surveys. After detailed on-site inspections of AEC's Ellis Road facility they recommended complete award to AEC of both contracts. They found AEC to have adequate facilities, skilled technical personnel and open capacity to perform the services required. Gerald W. Frye, the Industrial Specialist who led the pre-award survey, wrote:

> The contractor has a complete understanding of the requirements of this bid item. Mr. Maxwell Cobb has a total of 21 years experience in handling PCB materials and Mr. Michael Hamm has been with American Electric Corporation for two years and has a thorough knowledge of the requirements for handling PCB materials. American Electric Corporation has adequate facilities, technical skilled personnel and open capacity to perform the services required. (Pre-Award Survey, September 4, 1981)

26. EPA Region IV was also contacted during the course of each pre-award survey. EPA advised that AEC had been recently inspected and that no improprieties in their business practices had been found, and no violations had been issued.

27. Prior to awarding the Ogden I contract to AEC, Mr. Bertagnolli himself traveled from Ogden, Utah to AEC's facility at 523 S. Ellis Road in Jacksonville, Florida. After visiting AEC's facility and speaking with its officers, Bertagnolli was satisfied that the firm was capable of performing the Ogden I contract and proceeded to award it to the firm. However, during this visit, Bertagnolli never inspected AEC's storage tanks to determine how many gallons the storage tanks could hold, how many fluids were on hand, or the PCB concentration of the various tanks. Bertagnolli also never personally checked whether AEC had formal agreements with ENSCO and Rollins.

28. The procedures in use at the time AEC successfully bid the Ogden I Contract were scant. AEC was to pick up the materials at the DOD facilities and note the pick-up by use of a manifest system. The manifest to be used was essentially a shipping document providing the following information: the names and addresses of the generator, the facility designated to handle the waste; the names of all transporters; a description of the amount, composition and quantity of the waste; the number and types of containers; and the origin, routing and destination of each shipment. The generator of the waste had to certify that the information on the manifest was accurate and the materials were acceptable for transport. Information on actual disposal of the waste was also provided through this manifest system.

29. The manifest tracking system tracked the pick-ups made by AEC. At the time of Ogden I, AEC would be paid if the item appeared on a manifest, and the manifest was properly signed, and Bertagnolli received a report that some material had been picked up. No effort was made to see that disposal of the material was actually accomplished.

30. No one at DPDS had the responsibility of determining that AEC or any other contractor properly disposed of the materials removed from the DOD. Under the Ogden I Contract, the contracting officer did not even know which quantities of ma-

terials he was paying AEC to dispose of. During trial, AEC's chemist, John Ezell, testified that the PCB fluid to be disposed would be diluted so that the PCB concentration would correspond with the concentration indicated on the manifests (Tr. 127–29).

31. Moreover, during Ogden I AEC received payment for disposal upon certification of removal. Many of the items picked up by AEC contained PCBs in excess of 500 ppm. ENSCO never received any fluids from AEC, and Rollins received only one shipment of fluids in excess of 500 ppm during 1981 (Deposition of Dubbin at 5), and did not receive additional shipments until mid-May, 1982. (*Id.*).

32. During the administration of Ogden I, Bertagnolli received a call from Richard Schmigel who, while an AEC employee, was in charge of pick-up and delivery of PCB items during Ogden I. In September 1981, and prior to the awarding of the Battle Creek I Contract, Schmigel advised Bertagnolli that things [regarding disposal] were not on the "up and up" with AEC. Schmigel said this was true both under the Ogden I Contract and the proposed Battle Creek I Contract. Bertagnolli took down Schmigel's name and telephone number. Thereafter, Bertagnolli contacted legal counsel at Battle Creek and advised them of the telephone call. Bertagnolli did not advise Ronald Wagner because Bertagnolli believed that Schmigel was just a disgruntled employee. Schmigel testified that the tanks at AEC contained PCB oil in concentrations greater than 500 ppm during the Ogden I Contract and that the PCB oil picked up at the various DOD facilities under Ogden I were pumped into all of the tanks at AEC indiscriminately. Tanks were filled on a space availability basis and not according to PCB concentration levels. AEC chemist, John Ezell, and Vincent Cassidy of Bio-environmental Securities Division of the City of Jacksonville, confirmed Schmigel's testimony that all the PCB fluids at AEC's storage facilities contained PCB contamination far in excess of 500 ppm as early as August, 1981 (Tr. at 96, 121, 193, 195).

At trial, Schmigel testified that AEC did not have adequate facilities to store all the PCB oil picked up by AEC, and that a tanker parked in the AEC yard would be filled up, leave, and return to the yard empty two hours later (Tr.100). Holloway owned a red tanker that was kept at AEC's lot, and also used to make waste oil deliveries to Dickerson (Tr. 24) (See Finding # 12).

33. It was AEC's procedure to pick up the materials at the various DOD facilities and bring them to Jacksonville, Florida for storage even though the contract terms required AEC to dispose of all items within sixty days from the date of pick-up. The DOD, through DPDS, was aware of the time limit, and on more than one occasion, Bertagnolli had conversations with Audrey Quackenbush regarding the difficulties that American Electric Corporation was having in performing in that period.

34. Between March and September 1981, Quackenbush advised Bertagnolli that the disposal under Ogden I Contract was not being completed because AEC did not have any signed contracts with the disposal sites. Bertagnolli acknowledged the disposal problem and insisted that no payment would be made until AEC disposed of the material. Quackenbush also advised Bertagnolli that the PCB oil stored at the AEC facility was commingled, and that AEC was having a difficult time in matching the PCB content as set forth in the contract with the oil they were disposing. *See* Finding # 30.

35. Bertagnolli did not know at the time of the final payment under Ogden I whether the items from Ogden I had been properly disposed of. When asked "How can you possibly track down the proper disposal of PCB fluids if you don't know how much you were disposing of?" Bertagnolli replied, "I guess you can't" (Bertagnolli Deposition at 90).

36. Al DiGennaro was responsible for writing specifications for government contracts. He drafted the technical disposal specifications in the Ogden I solicitation. DiGennaro did not know what was done to provide for the tracking of PCB waste from the generator to final disposal.

37. DPDS did not verify the disposal of any of the items under Ogden I or communicate with any final disposal sites. A single phone call would have revealed grave problems in AEC's conduct under Ogden I. For example, AEC submitted eight invoices listing American Environmental Protection Agency at 1804 West Main, Greensboro, Alabama, as the treatment storage or disposal facility for approximately 65 drums of PCB liquid over 500 ppm and numerous pieces of contaminated equipment (e.g., transformers) containing PCB levels of over 500 ppm. In fact, the Greensboro location was the antebellum home of Michael Hamm, Vice President of AEC. No PCBs could have been accepted at that location, and none was deposited there. *See* plaintiff's exhibit 16.

38. When the Battle Creek I Project was awarded, Ronald Wagner, the contracting officer, relied solely on Bertagnolli's assessment of AEC's performance under Ogden I. Wagner did not ask Bertagnolli about the ultimate disposal of the items under the Ogden I Contract, and Bertagnolli did not tell Wagner about his call with the former AEC employee, Schmigel, or a protest by Cecos International, a competitor of AEC, that AEC could not perform the Ogden I Contract (Wagner Deposition, Vol. II at 333–34). Also, Wagner did not check the quantity of PCB fluids then stored at the AEC facility to determine whether AEC had sufficient capacity to handle the Battle Creek I Contract. Nor did he determine the concentration of PCBs in AEC's storage tanks. Likewise, Wagner did not check with any of the companies with whom AEC dealt nor with the state and local EPA to determine whether AEC had properly performed under the Ogden I Contract. (*See* Wagner Deposition, Vol. II.)

39. Wagner was concerned that AEC was performing behind schedule under the Ogden I Contract, and was "spread thin." At the pre-award survey he asked for reverification that AEC was both technically and organizationally capable of performing under Battle Creek I. (*See* Defendant's

Exhibit 14), Wagner Deposition, Vol. IV at 570, 571.)

40. Wagner understood that the federal government, as a generator of hazardous waste, was under a duty to follow its PCB waste from "cradle to grave" to ensure proper disposal (Wagner Deposition, Vol. I at 108). Nevertheless, Wagner essentially did no more in administering the contract than rely on the manifest documents provided by AEC.

41. At the time of the Ogden I and Battle Creek Projects, Jacksonville Bio–Environmental Services and the United States EPA were conducting investigations of AEC. The investigations began in 1980, before the contamination of plaintiff's tanks. However, even though these investigations were being conducted both by the local and federal EPA agencies, and by the local environmental agency within the City of Jacksonville, neither Wagner nor Bertagnolli investigated AEC with the local environmental agencies.

42. Wagner made a partial payment of $418,000 to AEC on the fact that AEC "picked up" hazardous PCB materials from the DOD facilities even though inadequate records existed to show proper disposal.

43. Wagner stated the problems with AEC might have been avoided at an early stage in 1981 "if we'd sent more of our technical people down to their facility to look for themselves" (Wagner Deposition, Vol. II at 357).

44. Had an inquiry been made to the city of Jacksonville Bio–Environmental Services regarding AEC's ability to perform under Battle Creek I, Vincent Cassidy, who was handling PCB matters for the city, would have informed Wagner that the color-coded storage tanks at AEC, which Wagner saw on his visit, were either unintentionally or intentionally cross-contaminated with PCBs greater than 500 ppm (Tr. 192–93).

45. AEC began picking up fluids under the Ogden I Contract March 1981, and under the Battle Creek I Contract November 18, 1981. AEC's storage facilities were mostly full when pick-ups under the Battle Creek I Contract commenced. Pick-ups continued through the first part of January 1982.

46. During this same period of time, Holloway regularly picked up waste oil from AEC. On one occasion an incident occurred at Dickerson's Shad Road facility in which a load of oil would not burn. Ken Graden, Holloway's truck driver, retrieved the load and returned it to AEC.

47. After that incident, Holloway employees knew they were picking up PCB-contaminated waste oil but continued to do so because they thought they would lose their jobs (Tr. 160).

48. Graden testified that during 1981 Holloway employees would pick up oil directly from AEC at their storage tanks and either take the oil back to Holloway or directly to Dickerson. On one occasion, Graden also picked up oil from AEC trucks and took it directly to Dickerson (Tr. 142–44).

49. On January 8, 1982, the Bio–Environmental Services informed Dickerson that its lab tests revealed concentrations of PCB greater than 500 ppm at all of Dickerson's facilities.

50. Thereafter, Dickerson discontinued use of all its tanks and production of asphalt was reduced from January 8, 1982 until March 1982.

51. Dickerson was given permission from the EPA to consolidate all of the oil from its various tanks at Shad Road and Sommers Road to the large tank on Edwards Street. Dickerson encased the large tank in concrete to prevent any possible spills from seeping into the ground water. In order to protect the environment from a release of PCBs, Dickerson employed Pinkerton's Security Service and California Plant Protection Security Service. The guard service was discontinued on July 11, 1986 after all of the PCB material had been finally disposed. Dickerson paid for the disposal under the terms of a bid contract

with Hazardous Waste Technology Services ("Haztech"). Dickerson had solicited bids from various contractors. The bids were all in excess of $800,000 with open-ended additional money provisions.

52. At the time its injury was discovered, Dickerson was unable to pay for the disposal of the PCB material. Dickerson obtained permission from EPA to store the material. EPA advised Dickerson that they would not institute proceedings against it pending resolution of the lawsuit. Dickerson cleared the various tanks at the Shad Road and Sommers Road facilities through Holley Electric.

53. After the discovery of the contamination at Dickerson, Dickerson hired legal counsel.

54. In March 1982, DPDS gave a partial payment of $418,000 to AEC even though it was aware of the allegations of Dickerson, and even though AEC had given no proof of disposal to DPDS.

55. Thereafter, DPDS instituted an investigation of the manifest tracking system to determine the amount of any unaccounted for PCB materials. DPDS determined that twenty-five (25%) of all PCB fluids under Battle Creek I were still unaccounted for.

## CONCLUSIONS OF LAW

The threshold question in this case is whether the United States government can be held liable for the acts of an independent contractor pursuant to the Federal Tort Claims Act (FTCA). We hold that in this case the United States can be held liable. The FTCA waives federal sovereign immunity for:

[P]ersonal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). The United States has not consented under this section to be sued for the torts of its independant contractors. *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). However, under Florida law, one who employs an independent contractor to engage in certain types of activity may be held directly liable for its failure to ensure that the independent contractor acts in a non-negligent manner. *Emelwon, Inc. v. United States,* 391 F.2d 9, (5th Cir.1968), *cert. denied,* 393 U.S. 841, 89 S.Ct. 119, 21 L.Ed.2d 111 (1968); *see also Griffin v. United States,* 637 F.2d 308 (5th Cir.1981). Section 1346(b) therefore arguably subjects the government to liability in this case.

However, the FTCA also contains an exception to the waiver of sovereign immunity, the exception provides in pertinent part that the Act does not apply to:

(a) Any claim based upon ... the exercise or performance, or the failure to exercise or perform a discretionary function or duty ... whether or not the discretion involved was abused.

28 U.S.C. § 2680. Under this provision, the government would remain immune from suit in this case if we determine that the selection and supervision of AEC to remove and dispose of PCBs from military installations constituted discretionary acts.

The Supreme Court interpreted the discretionary function exception in the watershed case, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). In *Dalehite* the Court endorsed a broad interpretation of the discretionary function exception and held that the exception

includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that

is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion. [Footnote omitted.]

*Dalehite, supra* at 35–36, 73 S.Ct. at 968.

The Supreme Court appeared to be narrowing the broad rule enunciated in *Dalehite* in subsequent cases. *See Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955); *Eastern Air Lines, Inc. v. Union Trust Co.*, 221 F.2d 62, aff'd *per curiam sub nom. United States v. Union Trust Co.*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955). However, the Court disavowed any trend toward a narrowing of the exception in *United States v. S.A. Empress de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). In *Varig Airlines* the court held that the Federal Aviation Administration (FAA) is immune from suit for acts growing out of its decision to implement a spot-check system of inspecting aircraft to insure compliance with applicable FAA rules and regulations.

The Court identified two important aspects of the discretionary function exception. First, the basic inquiry covering the exception "is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Varig Airlines, supra* at 2765. Second, the exception "plainly was intended [by Congress] to encompass the discretionary acts of the Government acting in its role as a regulator of private individuals." *Id.* (Footnote omitted.) Application of the exception in the instant case does not implicate the government's role as a regulator of the conduct of private individuals. Our inquiry, therefore, is whether or not the acts challenged in the instant case are "of the nature and quality that Congress intended to shield from tort liability."

Eleventh Circuit case law provides considerable guidance in determining whether the governmental acts challenged here are "of the nature and quality that Congress intended to shield from tort liability." For example, in *Andrews v. Benson*, 809 F.2d 1537 (11th Cir.1987) a Tennessee Valley Authority (TVA) lineman brought suit alleging that co-employees breached their legal duty to him by failing to provide safety equipment as required by TVA rules and Occupational Safety and Health Administration (OSHA) standards. In holding the defendants liable for suit, the court noted that the "doctrine [of sovereign immunity] exempts a government employee from liability for common law tort suits 'only if the challenged conduct is a discretionary act *and* is within the outer perimeter of the actor's line of duty.'" *Andrews, supra* at 1542, *quoting Johns v. Pettibone Corp.*, 769 F.2d 724, 728 (11th Cir.1985) (emphasis in original). In the instant case, there is no question that the challenged acts were within the outer perimeter of the actor's line of duty. Therefore, more to the point for our purposes is the *Andrews* court's second observation that the discretionary function exception "protects only those acts of a federal employee that involve planning or policy considerations while acts involving day-to-day operations are not covered by official immunity." *Id.* at 1542, *citing Franks v. Bolden*, 774 F.2d 1552, 1555 (11th Cir. 1985).

The scope of the discretionary function exception was further defined in *Alabama Electric Cooperative, Inc. v. United States*, 769 F.2d 1523 (11th Cir.1985). There the court considered whether all design decisions are inherently discretionary and therefore immune from suit. In rejecting the government's contention that all design decisions fall within the discretionary function exception, the court noted that the planning level/operational level distinction adopted by many courts remained valid subsequent to the *Varig Airlines* decision. The court quoted with approval from *Swanson v. United States*, 229 F.Supp. 217 (N.D.Cal.1964) where the court explained the significance of the planning/operational distinction.

In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion. *The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy.* [Decisions] ... are on the planning level because of the necessity to evaluate policy factors when making those decisions.

The operations level decision, on the other hand, involves decisions relating to the normal day-by-day operations of the government. *Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors.*

*Id.*, at 1528, *quoting, Swanson, supra* at 219–20 (emphasis in original); *see also United States Fire Insurance Co. v. United States*, 806 F.2d 1529, 1535–36 (11th Cir.1986).

The court in *Alabama Electric Cooperative* further observed that " 'if a government official in performing his statutory duties must act without reliance upon a *fixed or readily ascertainable standard,* the decision he makes is discretionary and within the discretionary function exception. Conversely, if there is a standard by which his action is measured, it is not within the exception.' " *Id.* at 1529 (emphasis in original), *quoting, Miller v. United States*, 710 F.2d 656, 663 (10th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983). The key inquiry is "whether or not the professional discretion involves policy considerations." *Id.* at 1529 n. 2; *see Heller v. United States*, 803 F.2d 1558 (11th Cir.1986).

■ Having considered the applicable law, we conclude that the government is not subject to liability for the negligent selection of AEC as an independent contractor, but is subject to liability for its negligent failure to insure the removal operation was conducted in a proper manner.

The government's decision to select AEC falls squarely within the discretionary function exception of the FTCA. In this regard we need not reach the issue of whether the selection of AEC was made pursuant to a fixed and ascertainable standard. It suffices to hold that the decision to select AEC was made at the planning level, and for this reason is immune from legal challenge.

The initial decision to use private contractors to dispose of PCBs was made by the DPDS who had assumed responsibility for the disposal of PCBs pursuant to Defense Environmental Quality Program and Policy Memoranda 80–5 and 80–9 (Finding # 15). This decision was based on several factors, including a decision to hire a competent contractor from the civilian sector because of a lack of governmental expertise, and a need to maximize limited resources. (*See* testimony of Nancy Rheaum, Tr. at 322.) Moreover, the government's limited storage facilities further militated in favor of hiring a civilian contractor to remove the PCBs.

Likewise, a decision was made to encourage small businesses to participate in the project by separating the disposal contracts into line item bids. AEC was the lowest bidder on a significant portion of the contracts. After extensive inspection of AEC's facilities, including its equipment, safety procedures, training plans, layout of the yards, etc., AEC was determined to be a responsible bidder consistent with Department of Defense Regulations. (*See* Tr. of Closing Summary at 23.) Likewise, AEC's technical and financial capabilities were evaluated, its plant safety was assessed, and its performance history reviewed. *Id.* Clearly, the decision to select AEC was infused with planning and policy considerations. The decision did not involve the sort of day-to-day operations not covered by sovereign immunity. *See Andrews, supra* at 1542.

■ Alternatively, we conclude the government is liable for its failure to supervise AEC to ensure proper disposal of the PCB waste fluids. This conclusion is based on several factors. First, as noted

above, Florida law is clear that an employer who engages an independent contractor to conduct an inherently dangerous activity has a non-delegable duty to ensure the task is carried out in a non-negligent fashion. *Emelwon, Inc., supra.* The day-to-day supervision of an independent contractor must be carried out at the operational level, and does not involve the evaluation of policy factors.

Moreover, environmental statutes and regulations place an affirmative duty on the government, as producer of PCBs, to ensure the safe disposal of PCB waste from cradle-to-grave. *See* Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601–9657 (1983); Toxic Substance Control Act (TSCA), 15 U.S.C. §§ 2601–2629 (1983); TSCA PCB Regulations, 40 CFR 761 (1981). CERCLA authorizes state and federal governments to institute actions against responsible parties for the containment, cleanup, and removal of hazardous wastes. 42 U.S.C. § 9604 (1983). Responsible parties include generators of hazardous waste who contract for its disposal. *Id.* § 9607(a)(3). *See, e.g., Violet v. Picillo,* 613 F.Supp. 1563 (D.R.I. 1985); *United States v. Northeastern Pharmaceutical and Chemical Co., Inc.,* 579 F.Supp. 823 (W.D.Mo.1984).

Likewise, TSCA and the PCB Regulations provide specific rules for the proper disposal of PCB waste. 15 U.S.C. 2605(e); 40 CFR 261.10. TSCA additionally imposes direct liability on the government for violation of its provisions:

> ... any person may commence a civil action against (1) any person (including (A) the United States, and (B) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of this chapter or any rule promulgated under Section 2603, 2604 or 2605 of this title ...

15 U.S.C. § 2619.

Finally, we find especially persuasive the fact that DPDS internal policy has always recognized the government's cradle-to-grave responsibility for hazardous waste. *See* Letter from R. Wagner to H. Wegert of March 23, 1983, Plaintiff's Exhibit 36, in which Ron Wagner wrote:

> 3. It is recognized that disposal contracts involving PCBs (extremely toxic and hazardous wastes) are different in important ways from the usual service contract. Improper disposal of PCB material and fluids will result in a serious health risk to the public at large. Additionally, DPDS as generator of the hazardous wastes by law has "craddle-to-grave" (sic) responsibility for the waste and is thereby vulnerable to civil litigation for the foreseeable future if injury and/or death to persons can be established to have been caused by a DPDS contractor's improper disposal of PCB materials and/or fluids. Reprocurement action against the defaulted contractor's account is largely ineffective in view of the damage to the environment which has already occurred, and owing to very difficult material/fluid tracking problems.

For the foregoing reasons, we therefore conclude that the government is under a statutory duty to ensure proper disposal of PCBs according to a fixed and ascertainable standard. It must carry out this duty at the operational level. Thus, the acts challenged in the instant case are not of the nature and quality that congress intended to shield from tort liability, and therefore do not fall within the discretionary function exception to the FTCA's general waiver of sovereign immunity.

■ As discussed above, the Federal Tort Claims Act imposes liability on the government for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C.

§ 1346(b). Under Florida law the essential elements of a negligence cause of action are: (1) the existence of a duty on the part of the defendant to protect the plaintiff from the particular injury or damage; (2) the failure of the defendant to perform that duty; and (3) injury or damage to the plaintiff proximately caused by this failure. *Lake Parker Mall, Inc. v. Carson*, 327 So.2d 121 (Fla.Dist.Ct.App.1976). The mere fact that an accident or injury has occurred will not render a defendant liable for negligence. *Abrams v. Nolan Brown Cadillac Co.*, 228 So.2d 131 (Fla.Dist.Ct. App.1969).

Florida law imposes upon all persons a duty to act as a reasonably prudent person would act under the same or similar circumstances considering the reasonably foreseeable risk of harm to persons similarly situated as the plaintiff. *Miriam Mascheck, Inc. v. Mausner*, 264 So.2d 859 (Fla. Dist.Ct.App.1972). Additionally, and more to the point in this case, Florida imposes a non-delegable duty on an employer to ensure that an independent contractor engaging in an inherently dangerous activity acts in a non-negligent manner. *Emelwon, supra; Griffin, supra; cf. Scoti v. McKeon Construction Co.*, 666 F.2d 170 n. 2 (5th Cir.1982).

■ Although plaintiff does not specifically argue this point, defendant's breach of its statutorily imposed cradle-to-grave duties under CERCLA, TSCA and the PCB regulations constitutes prima facie evidence of negligence under Florida law. *DeJesus v. Seaboard Coast Line Railroad Co.*, 281 So.2d 198, 201 (Fla.1973); *Schulte v. Gold*, 360 So.2d 428 (Fla.Dist.Ct.App. 1978).

In addition to the prima facie case of negligence raised by defendant's violation of the relevant statutes, we find the evidence adduced at trial amply provides an independent basis for finding that the government breached its duty to properly supervise AEC in the disposal of the PCB waste. Our starting point in this regard is Nancy Rheame's admission that the government did not conduct any supervision of AEC's disposal of the PCB waste:

Q. Now, as a part of carrying out the mission, did you have any agency people supervise the contractors that you hired to do the disposal?

A. Our agency people, you mean Defense Reutilization?

Q. Yes.

A. No, we do not supervise private contractors.

(Tr. 332).

Additionally, the government failed during the Ogden I and Battle Creek I Contracts to take even minimal steps to ensure proper disposal of the waste. Neither Bertagnolli nor Wagner, the two officers in charge of the contracts, had any prior background or training with PCB material or waste (Finding # 20). Bertagnolli never personally checked to ensure that AEC had formal agreements with the two ultimate disposal facilities (Finding # 27). The manifest tracking system in place under both Ogden I and Battle Creek I was so inadequate that AEC's chemist could dilute PCB loads to ensure that the PCBs concentration of the waste corresponded to that set forth on the manifests (Tr. 126–27). 25% of the waste to be disposed remains missing.

Likewise, numerous red flags should have warned the government of AEC's problematic performance under the contracts. For example, AEC's bid under Ogden I was dramatically lower than its competitors (Finding # 22). Also, both Richard Schmigel (Finding # 32) and AEC Secretary, Audrey Quackenbush (Quackenbush Deposition at 27) (Finding # 33) called Bertagnolli attempting to apprise him of serious problems at AEC. Finally, manifests submitted to Bertagnolli indicated disposal of much less waste fluid under Ogden I than the government had estimated needed disposal. (Bertagnolli Deposition, Vol. III at 215, 219–21).

We therefore conclude that the government breached its duty to properly supervise AEC to ensure correct disposal of the

government's PCB waste. This conclusion, however, does not terminate our inquiry. We must also determine whether the government's conduct constituted the proximate cause of the plaintiff's injuries.

■ In this regard, the crux of this case is accurately summarized in the following exchange between the government and the Court.

> The Court: [The environmental protection statutes] say [ ] that the generator [of PCB waste] is liable.
>
> Ms. Beane: That's right, the generator is liable, and if the plaintiffs in this case can prove that materials that were generated by the United States absolutely ended up in their tanks that might give us room for pause, but that just hasn't happened in this case ...

(Tr. of Closing Summary at 31). We agree with the government's assessment that this case turns on whether the government's PCB waste ended up in the plaintiff's storage tanks. However, we disagree with the government's assessment that in order to prevail the plaintiff must show the government's PCB waste *absolutely* ended up in its tanks. Plaintiff need only show by a preponderance of the evidence that the government's PCB waste ended up in its tanks. *See Nielson v. City of Sarasota,* 117 So.2d 731 (Fla.1960). Moreover, this ultimate fact may be proved by circumstantial evidence. *Tucker Brothers, Inc. v. Menard,* 90 So.2d 908 (Fla.Dist.Ct.App.1956).

■ The plaintiff's evidentiary case requires us to draw two inferences from the facts. First, that Holloway picked up the government's PCB laden waste oil from AEC, and second, that Holloway delivered the oil to the plaintiff.

> [T]he established rule of evidence is that we cannot construct a conclusion upon an inference which has been superimposed upon an initial inference supported by circumstantial evidence unless the initial inference can be elevated to the dignity of an established fact because of the presence of no reasonable inference to the contrary.

*Commercial Credit Co. v. Varn,* 108 So.2d 638, 640 (Fla.Dist.Ct.App.1959) (citations omitted).

The critical fact in our determination that Holloway picked up PCB waste oil from AEC is the government's own estimate that 25% of the oil removed by AEC from military installations pursuant to Battle Creek I and Ogden I remains missing. Plaintiff has presented an abundance of circumstantial evidence from which we must conclude that Holloway picked up PCB waste from AEC. For example, AEC's tanks were completely commingled with PCB contamination far in excess of 500 ppm as early as August, 1981. (*See* Finding ## 32, 34, 44; *see* Quackenbush Deposition at 36.) Floyd Holloway and AEC president, Max Cobb, were friends (Tr. 447), and had a symbiotic relationship (Tr. 146, 398; Deposition of Quackenbush at 30) in that the two exchanged services without payment. Holloway employees picked up oil at AEC during 1981. (*See* Findings ## 46, 48.) Holloway kept a red tanker at AEC's lot, which was also used to make waste oil deliveries to Dickerson (Finding # 32). Ken Graden, Holloway's truck driver, recalled a specific incident in which a load of oil delivered to Dickerson would not burn, and which was returned to AEC (Finding # 46).

Contrarily, the government produced the slimmest explanation accounting for the missing oil. *i.e.,* that it was dumped at AEC's Yellow Water Road facility in Baldwin, Florida, and even this explanation is a bare assertion that appeared for the first time in its post-trial brief on the issue of chain of custody (filed March 23, 1987). In this connection, we ignored the defendant's attachment to its post-trial brief on the ground that it was not introduced at trial. We deny the United States' motion to reopen the case to admit the attachment for the reasons set forth in plaintiff's response, namely, that the attachment is hearsay, and not newly discovered. The government's case therefore essentially rests on the possibility that Dickerson received the contamination from a variety of different

sources. Since Dickerson received at least 80% of its waste oil from Holloway, we find the government's theory to be implausible at best.

In view of the fact that the government did not present any direct evidence contradicting the plaintiff's assertion that Holloway picked up PCB-contaminated waste oil from AEC, we must conclude that the facts establish that Holloway picked up oil from AEC. *Cf. LaBarbera v. Millan Builders, Inc.*, 191 So.2d 619, 621 (Fla.Dist.Ct.App. 1966).

Likewise, we find the circumstantial evidence established that Holloway was the source of Dickerson's contamination. In August 1981 Dickerson completed a 250,-000–gallon storage tank, which was filled throughout the relevant time period. Dickerson received waste oil from three suppliers, but received 80% of its oil from Holloway. Not one of the other suppliers had a special relationship with AEC, as Holloway did.

Plaintiff acknowledges that its case on the chain-of-custody issue consists of a mosaic of circumstantial evidence. However, plaintiff argues, and we agree, that plaintiff need not meet the impossible burden of absolutely proving that the government's oil ended up in its tanks. Plaintiff urges us to adopt the rule set out in *United States v. Ottati & Goss, Inc.*, 630 F.Supp. 1361 (D.N.H.1985). There, the government sued a number of defendants under CERCLA for response costs. The court, relying on *South Carolina Recycling and Disposal, Inc.*, 20 ERC 1753 (D.S.C.1984) and *United States v. Wade*, 577 F.Supp. 1326 (E.D.Pa.1983) stated:

> These opinions are firm in their conviction that Congress did not intend to impose an impossible burden of causation on the government. "The only required nexus between the defendant and the site is that the defendant have [sic] dumped his waste there and that the hazardous substance found in the defendant's waste are also found at the site."

*Ottati, supra* at 1402, *quoting United States v. South Carolina Recycling and Disposal, Inc., supra* at 1757.

We are mindful that the case *sub judice* is not a strict liability or CERCLA case. However, we find the analogy to be an apt one in that in an environmental contamination case such as this, a plaintiff would never be capable of absolutely identifying the source of his injury. Moreover, as plaintiff correctly points out, it was the United States' own failure to properly supervise and manifest its PCB waste fluids that resulted in the difficulties plaintiff had in proving its case. Plaintiff has gone as far as it possibly could in proving the requisite causal link between defendant's misconduct and plaintiff's injury. To require plaintiff to prove proximate cause to a greater certainty would permit the government to gain an advantage from the lack of proof its very actions gave rise to. Under these circumstances, we cannot agree with the government that plaintiff must be held to an absolute standard of proof on the question of the chain-of-custody of the government's PCB contaminated waste fluids. *See Haft v. Lone Palm Hotel*, 3 Cal.3d 756, 91 Cal.Rptr. 745, 478 P.2d 465 (1970).

For the foregoing reasons, we conclude that Dickerson's storage tanks were contaminated by the government's PCB waste fluids, and that the government's negligence was therefore the actual cause of Dickerson's injuries.

We have not overlooked the government's contention that Dickerson's conduct was a superseding cause of its injuries. The government's contention in this regard rests on its assertion that Dickerson had a duty to test its waste oil for PCB pursuant to the PCB Regulations, 40 CFR 761.30(d). This provision states:

> (d) The use of waste oil that contains any detectable concentration of PCB as a sealant, coating, or dust control agent is prohibited. Prohibited uses include, but are not limited to road oiling, general dust control, use as a pesticide carrier, and use as a rust preventative on pipes.

We cannot agree that this Section prohibited Dickerson from using waste oil as a fuel

**1570**

source. No evidence was adduced at trial to prove an industry practice of testing waste oil for PCB when the oil was used as a fuel source.

We find Dickerson's decision to commence using waste oil in 1978 to be a business decision, (*see* Finding # 7), and do not find Dickerson's failure to timely apply for a state permit to burn the waste oil to have any relevance on the issue of Dickerson's contributory negligence (*see* Finding # 8).

█ Based on the foregoing discussion, we conclude that the government's negligent failure to ensure AEC properly disposed of the government's PCB waste was a foreseeable actual cause, and therefore was a proximate cause of the plaintiff's injuries. *See Pickerton–Hays Lumber Co. v. Pope*, 127 So.2d 441 (Fla.1961). The government is therefore liable to Dickerson for damages it incurred as a result of the PCB contamination of its facilities.

### ORDER

It is therefore ordered that the government's motion to reopen the case is denied, and judgment is entered in favor of plaintiff. This case will be set promptly for a trial on the issue of damages.

SO ORDERED.